IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


UNITED STATES OF AMERICA

v.                                                    NO. 5:98CR30-SPM/AK

TOD STEVEN FAUGHT,

                    Defendant.


## REPORT AND RECOMMENDATION


This cause is before the Court on Defendant Tod Steven Faught's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 with supporting affidavit. Docs. 173 & 183. Also pending are Defendant's motions to supplement which request consideration of *Blakely* and *Booker*. Docs. 267 & 270. The Government has responded to the motion to vacate, Doc. 185, and Defendant has filed his reply. Doc. 192. On February 12, 2007, the Court held an evidentiary hearing on one ineffective assistance of counsel issue. The Court has received the transcript of that proceeding, and thus, this matter is finally in a posture for decision. Having carefully considered the matter, the Court recommends that the motion to vacate be denied on all grounds.

## BACKGROUND

On April 29, 1999, a jury convicted Defendant on all sixty-six counts of a sixty-six count indictment for money laundering.  Doc. 75.  The jury also returned a special verdict of forfeiture, finding that

> the amount of $1,250,000.00 in United States currency was involved in one or more of the currency reporting or money laundering violations alleged in the indictment for which the defendant TOD STEVEN FAUGHT has been convicted, or that such property is traceable to property which was involved in such currency reporting or money laundering violations.

Doc. 78.

Defendant filed objections to the Presentence Report, including an objection based on his lack of knowledge that the moneys at issue were "drug proceeds."  Doc. 96.  At sentencing, the Court denied all objections, Doc. 105, and sentenced Defendant to 120 months on each of Counts One through Four and 189 months on each of Counts Five through Sixty-six, to be served concurrently.  Doc. 109.

Defendant appealed, charging that there was improper constructive amendment of the indictment, that there was insufficient evidence to support the verdict, that the Court improperly answered a question from the jury, that the Court improperly enhanced Defendant's sentence for his role in the crimes and for laundering drug proceeds, and that the Court improperly limited defense counsel's redirect of Defendant.  Doc. 166.  The court of appeals affirmed with the only explanation being that "there is no merit to any of the arguments the appellant[ ] make[s] in this appeal."  *Id*.

The instant petition ensued.  On this occasion, Defendant claims: (1) that his sentence violates *Apprendi*, and (2) that his trial and appellate counsel were ineffective.  Each claim will

be considered in turn.

## **DISCUSSION**

I.      Violation of *Apprendi*.

In his first claim for relief, Defendant charges that his sentence violates *Apprendi* "because his sentences were predicated upon facts [drug type and drug quantity] that were not alleged in the indictment nor established by proof beyond a reasonable doubt." Doc. 173, Amended Mem. at 7. According to Defendant, his sentence was improperly enhanced without the jury being instructed "that it had to find that the offense involved drugs" or without the verdict establishing "that the proceeds were from the sale of illegal drugs or importation of drugs." *Id*. at 8. Defendant recognizes that counsel "did object to the sentencing of the drug enhancement at sentencing," but argues that since *Apprendi* was a new rule of constitutional law, it should apply retroactively to criminal cases pending on direct review. *Id*. (emphasis in original).

In his reply, Defendant elaborates on this argument:

> Movant asserts that all elements of the alleged illegal activity (alleged to be illegal importation and sales of drugs) were essential element, whereas, no reasonable person, without knowing; (how the drugs were imported) (when the drugs were imported) (where the drugs were imported to) (what type of drugs was imported) and (the quantity of drugs were imported) could make a finding as to whether the illegal activity actually took place or as to whether monies involved were actually proceeds from such an activity, whereas no money laundering could exist without an illegal activity, it was essential that those elements be included in the indictment and decided by the jury, if government intended to use them to enhance movant offense, to laundering of monies from an illegal activity.

Doc. 192 at 2-3 (emphasis in original). According to Defendant, he "tried unsuccessfully to get trial counsel to raise the Apprendi issues on direct appeal, [but] counsel said whereas movant's sentence did not exceed Statutory Maximum, he saw no Apprendi Violations." *Id*. at 4.

Defendant maintains that he asked counsel again to raise the issue on motion for *en banc*

rehearing and on petition for writ of certiorari to the Supreme Court, and counsel failed to act on

Defendant's request.  *Id*.  In his estimation, "There is a reasonable probability that counsel's

<u>omissions</u> and...<u>errors</u> on Direct Appeal caused a miscarriage of justice."  *Id*.  Thus, according to

Defendant, the *Apprendi* errors were preserved, and "he has shown cause why they were not

included on Direct Appeal," and "to not hear them here would be a <u>miscarriage of Justice</u>...."  *Id*.

at 5 (emphasis in original).

Defendant's *Apprendi* claim is without merit.  In *Apprendi*, which was decided while the

instant case was on direct appellate review, the Supreme Court found:  "Other than the fact of a

prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi v.*

*New Jersey*, 530 U.S. 466, 490 (2000).  In the Eleventh Circuit, this holding was interpreted by

the *en banc* court as follows:

> Thus, *Apprendi* actually reaffirmed the longstanding practice of allowing judge-decided facts to affect the length of a defendant's sentence, including leaving the imposition of a mandatory minimum sentence within the purview of the trial judge.  *Apprendi* carved out only a limited exception to this general rule for facts that actually cause the sentence imposed on a defendant to exceed the prescribed statutory maximum, requiring that such facts be proven to a jury beyond a reasonable doubt rather than decided by a judge based on a preponderance of the evidence standard.

*United States v. Sanchez*, 269 F.3d 1250, 1262 (11th Cir.  2001).  The *Sanchez* court further

found *Apprendi* inapplicable to the Sentencing Guidelines:

> A factual finding under the Guidelines determines the sentence within the statutory range rather than outside it.  Because *Apprendi* only addresses facts that increase the penalty for a crime beyond the statutory maximum, it does not apply to those findings that merely cause the guideline range to shift within the statutory range.

*Id.*  Of course, since then, the Supreme Court has found otherwise and clarified its definition of "statutory maximum."  *See United States v. Booker*, 543 U.S. 220, 244(2005) (invalidating mandatory provisions of Sentencing Guidelines and reaffirming that any fact besides prior conviction that is necessary to support sentence exceeding maximum authorized by facts established by guilty plea or jury verdict must be admitted by defendant or proved to jury beyond reasonable doubt); *Blakely v. Washington*, 542 U.S. 296, 303 (2004) ("statutory maximum" for *Apprendi* purposes is maximum sentence judge may impose solely on basis of facts reflected in jury verdict or admitted by defendant).

As the Government points out, Defendant faced maximum terms of imprisonment of ten years on each count of Counts One through Four and of twenty years on each count of Counts Five through Sixty-six.  His sentences of 120 months on each of the first four counts and 189 months on each of the remaining counts were therefore within the "statutory maximum" as that term was interpreted both before and immediately after *Apprendi*.  Thus, not only was there no *Apprendi* error but also, in light of the Eleventh Circuit's interpretation of *Apprendi* in *Sanchez,* there was no prejudice from counsel's refusal to pursue an *Apprendi* issue on direct appeal, regardless of whether prejudice is analyzed under the standards for ineffective assistance of counsel or procedural bar.  *See McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir.  2001).

Furthermore, *Booker* is not retroactively applicable to cases on collateral review, as "*Booker*'s constitutional rule falls squarely under the category of new rules of criminal procedure that do not apply retroactively to § 2255 cases on collateral review."  *Varela v. United States*, 400 F.3d 864, 868 (11th Cir. 2005).  Therefore, Defendant's motions to supplement with *Blakely* and *Booker* are not well taken and have been denied by separate order.

II.     Ineffective assistance of counsel.

Because the remaining claims involve allegations that Defendant's trial and appellate counsel were ineffective, a consideration of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id*. at 697. The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for

determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather

whether a reasonable lawyer could have acted in the circumstances as defense counsel acted.

*Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

1.    Trial counsel.

     A.    Failure to require proof by Government to support introduction of coconspirator hearsay evidence pursuant to *James* and *Bourjaily*.

In this claim, Defendant charges that trial counsel acted ineffectively when he failed to file a pretrial motion for a *James* hearing and to make the appropriate motion at the close of the evidence. Doc. 173, Amended Mem. at 11 & Doc. 192 at 11. Though he does not allege any specifics regarding this claim, e.g., which witness' testimony counsel failed to challenge, the Government pointed the Court in the right direction. Doc. 185. at 12. On the first day of trial, the Government called Hans Wombach. Doc. 132 at 160. Mr. Wombach had met Defendant when Defendant was seeking to secure financing for his dredging company. *Id*. at 162-63. At some point during the course of their dealings, which had evolved into a request from Defendant to help him bring cash from overseas into the United States, Wombach introduced Defendant to Paul Murphy. *Id*. at 180. Defendant's counsel objected to anything that Mr. Murphy may have said to Mr. Wombach, but the objection was overruled. *Id*. at 182-83. However, a second objection was sustained. *Id*. at 184.

Before testimony resumed on the second day, Defendant's counsel made an *ore tenus* motion in limine:

> During the [course] of the direct examination of Mr. Wombach by [the Government], there were questions that were asked of him concerning conversations of other persons, including a Murphy, and I believe, Winters. We objected...on hearsay. And...the prosecutor made the comment concerning that these are statements of the conspiracy of some sort.

\* \* \*

At this point in time, on behalf of Tod Faught, I'm moving, in limine, Judge, that the prosecutor not be allowed to go into what arguably could be...construed as being some sort of co-conspirator hearsay statements in conjunction with his presentation of his case in chief, for a number of reasons.

Number one, the only indictment in this case was returned in July of 1998. It did not charge a conspiracy. It charged a scheme and it charged a number of individual counts....On a number of occasions subsequent to July 28th, inquiries have been made to whether there was going to be any type of superseding indictment in this case and obviously there has not been.

We are prepared now to defend substantive counts. We have not prepared and we are not on notice that there is a conspiracy or that we should have to be defending against a conspiracy, co-conspirator hearsay statements, anything of that nature.

Doc. 133 at 4-5.

In response, the Government explained:

As far as the conspiracy and the admissibility of co-conspirator statements, under the Federal Rules of Evidence 801, the case law is clear that there need not be a conspiracy charged in the indictment for the government to be allowed to present co-conspirator testimony in furtherance of the conspiracy as an exception to the hearsay rule in this particular case.

* * *

The government's position in this case...is that what we've established through the testimony and what we will establish through the testimony is that the defendant, Tod Faught, solicited first Hans Wombach, that is what we've heard so far, in moving money for him.

And Mr. Wombach replied that he wanted to know the legitimacy and have proof of the legitimacy of this money. That was not reflected by Tod Faught. He said: Do you know anyone else that can help me? And what Mr. Wombach reflected then is: Yes. And I checked around and I found this fellow, and his name was Murphy. And Murphy was then the one that he sets up the meeting in New York.

* * *

And clearly the government's position is, what I'm going to establish is, that they...acted in a joint venture. That is all I'm required to do. That is part of this joint venture, the statement one made to the other in furtherance of the conspiracy and that they elicited other people in furtherance of the conspiracy....All of those people [in Blountstown, Florida] were involved in this...from that point on. And

the statements and the communications, because they call all the time and pass messages and faxes....All of that should come out.

* * *

[A]ll I'm required to show is a joint venture...and...during the course of this trial, I'm going to be able to do that.

When I do...I think those co-conspirator statements in furtherance of the conspiracy are going to be admissible.  Those can be apprising the people of the developments or encouraging them to do this or giving instructions.

*Id*. at 7-12.

After hearing counsel's arguments, the Court found:

Counsel, in reference to the motion you made to the Court arguing that no conspiracy had been charged in the indictment and therefore co-conspirator statements are not admissible, the Court is going to overrule your objection on that point.  The Court finds that it's not necessary that a conspiracy be charged in the indictment for such co-conspirator statements to come in.

The Court has to determine, however, that the conspiracy did exist and that certain required findings would have to be made prior to those statements coming in.  First, that there was a conspiracy in existence.  Next, that the client was a member of that conspiracy, and next that the defendant against whom the statement was offered is–was also a member of that conspiracy.  Next, the statement was made in furtherance of the conspiracy, and five, the statement was made during the course of the conspiracy.

Having heard the testimony so far, or the witness, I think it's Hans Wombach, the Court now makes...those required findings.  I'm going to overrule the objection, deny your motion in limine and will allow statements by Wombach as to statements made to him by Murphy and relative to this conspiracy.

*Id*. at 12-13.

Pursuant to Fed. R. Evid. 801(d)(2)(E), a statement by a coconspirator made during the

course of and in furtherance of the conspiracy and offered against the party-opponent is not

hearsay.  Before such statement is admissible, however, the Court must make a finding that a

conspiracy existed, that the coconspirator and the movant against whom the statement was

offered were members of the conspiracy, and that the statement was made during the course of and in furtherance of the conspiracy.  *United States v. James*, 590 F.2d 575 (5th Cir. 1979).  The "conspiracy" label is a slight misnomer, as there is no requirement that the "conspiracy or agreement  be criminal in nature; it may be in the form of a joint venture."  *United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979).[1]

Defendant's allegation that trial counsel did not act effectively in this regard is flatly belied by the record.  Counsel challenged the introduction of Wombach's statements regarding conversations with Murphy, and therefore, he properly preserved the issue for appeal, and additional objections were unnecessary.  He was not required to lodge a pretrial challenge to testimony that he did not know would be offered, and he mounted his objections at the first opportunity during trial.  Counsel's failure to prevail on the motion in limine is not ineffective assistance of counsel.  The Court considered the *James* factors and found them to be present, thereby making the statements admissible pursuant to Rule 801, and there is not a reasonable probability that even if counsel had made a pretrial motion and renewed his challenge throughout the trial and at the end of the evidence that the outcome of the Court's ruling on this evidentiary matter would have been different.

---

[1]The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

B.      Failure to thoroughly investigate law and facts at trial and sentencing.

In this claim, Defendant charges that there was insufficient evidence to support the convictions under Counts One and Two for structuring financial transactions with the intent to cause the financial institution to fail to file a currency transaction report (CTR) and doing so as a pattern of illegal activity involving more than $100,000 in a twelve-month period.  According to Defendant, "If the transaction[s] that were deposited on the same date [were] consolidated as one transaction, and deposits at the same branch of a bank on [the] same date [are] consolidate[d] as one," then, as the Court understands his argument, the bank was required to file CTR's, and he did "nothing to cause South Trust Bank not to file" those CTR's since the two business accounts and two personal accounts at issue "were under the same <u>name</u> and under the same <u>Social Security Number</u>," Doc. 173, Amended Mem. at 12 (citations omitted) (emphasis in original). Defendant apparently believes that because "[t]here was no false information given to the Bank," he could not be held criminally liable under the antistructuring statute.  Doc. 192 at 15.  Thus, in Defendant's view, his trial counsel was ineffective for failing to investigate the law and the facts as to these matters.

In 1970, "in an effort to facilitate the investigation of criminal activity," Congress enacted the Bank Secrecy Act to require banks to report to the government certain currency transactions.  *United States v. Phipps*, 81 F.3d 1056, 1058 (11th Cir. 1996); *see also* 31 U.S.C. § 101 *et seq*.  Pursuant to the regulations, if the currency transaction exceeds $10,000, then the bank must file a CTR.  *Phipps*, 81 F.3d at 1058.  In 1986, Congress amended the Act to impose criminal liability on anyone who causes a bank to fail to file a CTR, causes a bank to report false information on a CTR, or "structures transactions in an attempt to evade the CTR reporting requirement."  *Id.*; *see also* 31 U.S.C. § 5324(a)(1)-(a)(3).  In pertinent part, Defendant was

charged with violating the antistructuring provision, subsection (a)(3), not subsections (a)(1) or (a)(2).  The antistructuring provision addresses the "'offense of structuring a transaction to evade the reporting requirements, without regard for whether an individual transaction is, itself, reportable under the Bank Secrecy Act.'"  *Id*. at 1061 (citation omitted).  Structuring a transaction is defined as withdrawing or otherwise participating in the transfer of a total of more than $10,000 in cash or currency by or through a bank "by setting up or arranging a series of separate transactions, each involving less tha[n] $10,000 individually, thereby intentionally evading the currency reporting requirements that would have applied if the transaction had not been so structured."  Basic  Instructions 9.1 *Eleventh Circuit Pattern Jury Instructions–Criminal* (2003).  Despite Defendant's protestations to the contrary, there is no requirement that the defendant's actions be willful, i.e., that they be committed "with bad purpose either to disobey or disregard the law."  31 U.S.C. § 5322(a) & (b); *Criminal Pattern Instructions* at 9.1 cmt.

After careful consideration, the Court finds that counsel did not render ineffective assistance in this regard, as the evidence clearly supported the two counts of illegal structuring. Defendant was not charged with causing South Trust to fail to file a CTR or with causing it to report false information on a CTR.  He was charged with structuring transactions at South Trust in an attempt to evade the CTR reporting requirement.  Most of Defendant's arguments do not even bear on that provision, and, to the extent that they do, they are without merit.  Therefore, counsel did not render ineffective assistance of counsel with regard to these allegations.

C.      Failure to interview and call favorable material witnesses.

In this claim, Defendant alleges that he told his attorney that "Andy Winners[2] and Paul Murphy [were] well aware of the source of the U.S. Currency alleged to have been the proceeds of specified unlawful activity."  Doc. 173, Amended Mem. at 13.  More specifically, he maintains that these men "would have testified that the currency in question was obtained from legitimate business transactions."  *Id*.  According to Defendant, trial counsel failed to interview them or call them to testify, and the fact that neither was a United States citizen was immaterial, as they had been arrested in Switzerland and were available for interview or to provide affidavits.  *Id*.  Defendant also refers to the business Relfix and "two Hispanic males" who could have testified about the proceeds of a $69,500 check and to Jerardo Rodrigues, the president of a Coral Gables bank, who "could have testified that the money was not Faught's," and Jairo Romero,[3] who "could have testified that he was not a member of the Colombian Mafia" and was not laundering drug money.  *Id*.

In response, the Government has submitted the affidavit of trial counsel, who states:

In conjunction with the preparation of [Defendant's] trial, Your Affiant spent hours reviewing records and discussing potential defenses and witnesses with [Defendant].  [Defendant] had the ability to give Your Affiant the names of any and all witnesses he though would be relevant to the defense of his case.

Your Affiant was provided a list of names by [Defendant]....Neither Romero nor Rodrigues [is] on that last, which came from [Defendant], initially, and was reduced to writing by Your Affiant for presentation to the Court.

The "two Hispanic males" were persons unknown to [Defendant], certainly unknown to Your Affiant, and apparently unknown to law enforcement.

---

[2]The Government spells this person's last name as "Winters."  Doc. 185 at 15.

[3]Defendant identifies this person as Jairo Romedo; counsel "believes" this person is Jairo Romero Madrano.  Doc. 185, Ex. 4.

Throughout the discovery process, at no time was Your Affiant ever provided specific names to go with the "two Hispanic males" in this case.

* * *

Your Affiant has no information as to what, if anything, Jerardo Rodrigues...could have testified to that would have been relevant to the case. The fact that he may have, as claimed by [Defendant], advised that the "money was not Faught's" would not have resolved the issue of the actions of the two Hispanic males in trying to get payment for a bounced or bad $69,500.00 check.

As to Jairo Romero and the claim of [Defendant] that he could have testified at trial that he (Romero) was not a member of the Colombian Mafia and was not laundering money, or interpreted otherwise from the [motion], that Mr. Faught was not a member of the Colombian Mafia and was not laundering drug money, a review of Mr. Romero's grand jury testimony is less than flattering insofar as his relationship with [Defendant] is concerned.

Your Affiant had access to the grand jury testimony of Mr. Romero and had discussed Mr. Romero at length with [Defendant].

I that grand jury testimony...Mr. Romero testified, under oath, that...Faught had called him in Miami, apparently after Mr. Faught's arrest, and advised Mr. Romero that if he was asked by anyone about dealings with Mr. Faught, that he (Romero) should say his dealings involved buying machinery by Mr. Faught from Mr. Romero, which would have been a lie. In response to a question to the effect that Mr. Faught wanted Mr. Romero to lie, Mr. Romero advised, in the grand jury testimony, that Faught did.

A further review of the grand jury testimony by the undersigned attorney led the undersigned attorney to believe that Jairo Romero, if called by anyone at trial, would have been a particularly devastating witness against [Defendant].
At no time was Your Affiant ever asked to produce Mr. Romero for trial purposes by [Defendant].

Your Affiant knows of no basis for utilizing a custodian of records from Relfix for trial purposes. Relfix was never considered as part of a viable defense.

Doc. 185, Ex. 4. Counsel did not address Defendant's allegations regarding either Winters or

Murphy.

Affidavits are not generally admissible at trial, *see generally*, 3 Am. Jur. 2d *Affidavits* §

19 (2006), and thus, counsel's failure to secure affidavits from Winters and Murphy was not

ineffective, as there is not a reasonable probability that the affidavits would have been admitted.

Counsel did attempt to exclude evidence seized during the arrests of both men because neither

was available to authenticate the documents. Doc. 137 at 7-8. Indeed, citing Fed. R. Evid. 403,

counsel argued for exclusion of any evidence related to the arrests of Winters and Murphy,

including introduction of their mug shots, their being in jail in Switzerland, and "whatever

activities are suspect under Swiss law...." *Id*. at 8-10 & 76-78. Otherwise, according to counsel,

such evidence made their "activities a feature of this case, even though their activities

presumably in Switzerland have nothing to do with the charges for which [Defendant is] on trial

here." *Id*. at 9. Counsel's objections with regard to the seized documents were continuing. *See*,

*e.g*., *id*. at 131 & 134.

It is clear to the undersigned that counsel's strategy was to limit the focus on either

Winters or Murphy to the extent possible. While it certainly was not possible to limit all

references to them, counsel succeeded in eliciting testimony from the Government's witness,

Sergio Rageizzone, a Swiss police officer, that Murphy and Winters were legitimate

businessmen. *See*, *e.g*., *id*. at 159-161. Counsel could not conceivably have wanted to put the

legality of Murphy's and Winters' business practices at issue any more than necessary, *see*, *e.g*.,

*id*. at 181-82, and if he had called them as witnesses, he would have faced the real probability

that their alleged illegal activities both in the United States and overseas would have unfairly

prejudiced his client when he was trying to present a defense that everything his client did was,

to his knowledge, legal and above reproach and well within accepted business practices.

Counsel was able to place that defense squarely before the jury through his own client, see, e.g.,

Doc. 139 at 135 & 150,  while limiting the possibility that the jury would convict Defendant

merely because he associated with persons who might have had less than stellar reputations in

the police community or engaged in shady business dealings.  These are precisely the types of

issues which counsel must weigh and evaluate in determining which witnesses to call during

trial, and Defendant cannot establish that "no competent counsel would have taken the action that

his counsel did take."  *Grayson*, 257 F.3d at 1216.

   With regard to Jerardo Rodrigues, the president of a Coral Gables bank, Defendant

denied knowing him or having any business dealings with him, *id*. at 205-06, and counsel's

determination that Mr. Rodrigues had nothing relevant to offer his client's defense, especially

when weighed against the prejudice to Defendant which would have resulted when the

Government cross-examined him on his seemingly illegal activities–Mr. Rodrigues processed

cash deposits without filing CTR's–was a reasonable determination.

   As to the two unknown Hispanic males who attempted to cash a $69,500.00 check to

"Relfix" drawn on one of Defendant's business accounts, the Court is not clear what Defendant

hoped to gain from tracking down these unknown persons or further investigating Relfix.  Surely,

Defendant did not allow checks to be written on his accounts to entities whose identity he did not

know, and there was no testimony offered at trial that this was one of the checks Defendant's

sister forged or that the check was otherwise misappropriated.  *See also* Doc. 132 at 93-94.

Furthermore, the Court does not know how counsel was to determine the identities of these men

when even law enforcement did not know who they were.  Counsel is only expected to engage in

reasonable, not extraordinary, investigation.

   Finally, as to Defendant's allegations regarding Jairo Romero, counsel's explanation for

not calling him as a witness is perfectly reasonable.  He weighed the benefits of Romero's

testimony against the prejudice of calling a witness who had testified before the grand jury that

Defendant had attempted improperly to influence or tamper with his testimony.  In counsel's

estimation, this would have been devastating to his client, and indeed, in this Court's view, this testimony from Romero would have focused on Defendant's post-arrest activities, rather than on the issues presented by the indictment and would have substantially prejudiced Defendant. Counsel's decision not to call Romero was not deficient performance.

> D.   Failure to require Government to obtain and disclose identity of "two Hispanic men."

This allegation is part and parcel of the previous allegation, but the Court would add that counsel cannot make the Government disclose information that it does not have and cannot obtain.

> E.   Failure to impeach Government witnesses.

In this claim, Defendant claims that counsel failed to impeach either Pam Wilson, Defendant's sister, or Tim Smith, a special agent with the Drug Enforcement Administration.  As to Ms. Wilson, Defendant maintains that counsel knew that she had been arrested before trial "and was told not to say anything about this arrest."  Doc. 173, Amended Mem. at 14.  As to Agent Smith, Defendant argues that counsel knew that Romero had denied to the grand jury Agent Smith's accusations that Romero was a member of the Colombian Mafia and was involved in laundering drug money with Defendant, and that counsel failed to impeach Agent Smith with Romero's denials.  The Court turns to the Wilson allegations first.

On direct examination, during the course of questioning Ms. Wilson about her forgery of checks on Defendant's business accounts, counsel for the Government asked her if she had been "arrested for forgeries or for bad checks."  Doc. 134 at 57.  She said, "No, sir....Tod had called and said for me to leave my son there and that he wouldn't press no charges."  *Id*.  On cross-examination, Defendant's counsel, after getting Ms. Wilson to admit to her numerous

convictions for forgery, asked, "Have you been arrested and charged with forgery or passing checks any other occasions that we haven't talked about?"  *Id*. at 77.  Wilson replied, "Not that I can recall."  *Id*.

According to Defendant, "prior to trial, Wilson had indeed been arrested and was told not to say anything about this arrest," a fact which counsel knew but did not use to impeach her. Doc. 173, Amended Mem. at 14.  In response, counsel states that the "issue complained of regarding witness Pamela Wilson and her check charges and prosecution or lack thereof were so insignificant in light of the overall problems facing the Defendant in this case that any specific question(s) that were not directed to Wilson...clearly would not have impacted this case."  Doc. 185, Ex. 5.

While it does appear that Ms. Wilson was charged with uttering a forged instrument and grand theft in Franklin and Gulf Counties, Florida, shortly before her appearance at trial in this case, *see* www.dc.state.fl.us/InmateReleases, usually, an arrest, as opposed to a conviction, is not a proper avenue for impeaching a witness, unless the arrest bears on the witness' character for truthfulness.  *United States v. Matthews*, 168 F.3d 1234, 1244 (11th Cir. 1999); *see generally* Fed. R. Evid.607-609.  An arrest for forgery would certainly bear on Ms. Wilson's character for truthfulness.  *Ad-Vantage Telephone Directory Consultants v. GTE Directories Corp*., 37 F.3d 1460, 1464 (11th Cir. 1994).  However, once she denied that she had been arrested for any additional crimes beyond those already divulged, counsel was precluded from proving those arrests by extrinsic evidence "and the questioning party must take the witness' answer." *Matthews*, 168 F.3d at 1244.  Even so, in counsel's view, any additional arrests were inconsequential, and the Court cannot fault that evaluation.  Counsel pointed out that "over the last eight or nine years [Wilson had] conducted herself repeatedly as a thief," and that she was

someone who would "steal money from people that are close to [her]."  There is not a reasonable

probability that pointing out one additional arrest or series of arrests would have been of any

consequence in the jury's assessment of Wilson's credibility or in tipping the verdict in

Defendant's favor.

Turning to Defendant's allegations regarding counsel's failure to impeach Agent Smith,

the Court finds them without merit.  In his affidavit in support of the criminal complaint filed in

this case, Agent Smith stated:

> According to a Drug Enforcement Administration confidential informant (CI),
> Jairo Romero is a member of the Colombian Mafia and is heavily involved in the
> laundering of Colombian drug money.
>
> * * *
>
> On December 2, 1997, Ocean Bank in Miami, FL, filed a Suspicious Activity
> Report regarding Jairo Electronics, Jairo Romero, and his wife Julieta Romero.
> The report stated that Romero claimed to be operating his business out of his
> garage and that the business consisted of exporting fans and electronic equipment
> to Colombia.
>
> * * *
>
> Records checks show numerous large currency transactions for Romero and his
> wife, including a Currency Transaction Report by Citibank in Miami showing a
> deposit by Jairo Romero of $160,000.00, in currency....
>
> The following evidence establishes that Tod Faught and Jairo Romero are linked
> together in their money laundering activities.
>
> -Three checks...drawn on [Faught's business accounts] have the notation "loan
> Jairo Electronics," or "Jairo Electronics," in the lower left corner of the check.
> These checks are signed by Tod Faught.
>
> -Two wire transfers...were made to Jairo Romero...from [Faught's business
> accounts]....
>
> -Analysis of telephone tolls records related to Faught and/or his associates
> establishes a connection between Faught and Romero.

> -A review of the checks written on Romero's account establishes that several of
> the payees on checks issued by Romero also appear as payees on checks drawn on
> [Faught's business accounts].

Doc. 1.

Defendant argues that counsel should have impeached the credibility of these statements,

which Smith did not repeat at trial, with Romero's grand jury testimony denying Smith's

allegations that Romero had ties with the Colombian Mafia and that he and Defendant were

involved in money laundering.  In response, counsel states:

> The testimony of Agent Smith regarding his knowledge and information relating
> to Romero did not constitute "false" testimony.  It was an opinion based upon
> investigation.  While Defendant Faught and the undersigned affiant absolutely
> disagreed with Smith's testimony, failure to ask specific questions of Smith
> [does] not constitute ineffective assistance of counsel.  In fact...Romero was not a
> good witness for this Defendant whether or not he ever was a friend, a member, or
> an associate of the Colombian Mafia.

Doc. 185, Ex. 5.

Having carefully considered the matter, the Court finds counsel's assessment of Smith's

averments correct and his position with regard to the statement imminently reasonable, and thus,

his actions in this regard were not ineffective.

F.    Failure to object to prosecutorial misconduct.

In this ground, Defendant charges that counsel acted ineffectively when he failed to

challenge the Government's "urging" of Wilson to lie to the grand and trial juries regarding

"being arrested and charged with forgery just prior to [Defendant's] trial...."[4]  As previously

noted, Defendant is correct that Ms. Wilson had been charged with grand theft and forgery just

---

[4]Defendant filed two motions to supplement this claim, which the Court allowed.  Docs.
217, 228, & 238.  The Court has reviewed the motions and finds nothing in them to alter the
Court's analysis of this claim.

weeks before her testimony in this case; however, he has absolutely no support for his accusation that the Government improperly "urged" Wilson to lie about her criminal history.  While she was certainly less than candid when both the Government and defense counsel questioned her about her arrests, once Wilson denied having been arrested beyond those times specifically pointed out to her, there was nothing counsel could do, and in this Court's view, a few additional arrests for the same types of crimes for which she had previously been convicted would not have further eroded her character for truthfulness in the mind of the jury in any appreciable way.  Thus, there is not a reasonable probability that the outcome of the proceeding would have been different.

> G.      Failure to request competency hearing on Pamela Wilson.

In this ground for relief, Defendant argues that his due process rights were violated "when counsel...allowed a mentally ill person Pamela Wilson to testify."  Doc. 173, Amended Mem. at 16.[5]  In response, counsel states that he "did not believe it necessary or even appropriate to seek some sort of mental examination of this particular witness.  In the overall scheme, she was relatively insignificant."  Doc. 185, Ex. 6.

"Every person is competent to be a witness except as otherwise provided in [the Federal Rules of Evidence]."  Fed. R. Evid. 601.  Rule 601 specifically excludes any mental qualification for testifying because "[s]tandards of mental capacity have proved elusive in actual application." *Id*. at advisory committee's note.  "[F]ew witnesses are disqualified on that ground," and the court's discretion "is regularly exercised in favor of allowing the testimony" since a "witness wholly without capacity is difficult to imagine."  *Id*.  The question of a witness' mental

---

[5]Defendant also filed two motions to supplement this claim, which the Court allowed. Docs. 212, 218, & 238.  The Court has reviewed the motions and likewise finds nothing in them to alter the Court's analysis of this claim.

competency "is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." *Id*.  The case cited by Defendant, *United States v. Gutman*, 725 F.2d 417 (7th Cir. 1984), is not to the contrary.

Counsel questioned Pamela Wilson directly and pointed out her pattern of deception and thievery, particularly where it involved members of her most immediate family, Defendant and their mother.  He also questioned her about her mental illness and treatment for it and elicited from her the drugs she had taken and the course of treatment she had followed.  This was sufficient.  On paper, her testimony appears coherent, but whether it was credible was entirely up to the jury.  While the Court might not agree with counsel's estimation that Wilson was a "relatively insignificant" witness, the Court does not believe that he ineffectively questioned her with regard to her mental capacity or her level of veracity or that he acted in a manner contrary to what other competent counsel would have acted under the same circumstances.  He had the information that he needed regarding her mental illness, he questioned her about it, and that was sufficient.

> H.     Failure to object to jury instructions or request specific instructions.

In this claim, Defendant maintains that counsel was ineffective for failing to request an instruction on the money laundering counts (Counts Five through Sixty-six) which included elements for drug crimes.  This is an extension of Defendant's prior *Apprendi* arguments.  He also apparently argues that counsel should have requested an instruction on conspiracy.

The Court properly instructed the jury on the elements of money laundering, using the pattern instruction approved for use in the Eleventh Circuit.  Doc. 135 at 15-20; Offense Instructions 70.2 *Eleventh Circuit Pattern Jury Instructions–Criminal* (2003).  The instruction requires that the Court identify the "specified unlawful activity," but it does not require that the

Court then instruct the jury on the substantive elements of that unlawful activity.  Defendant was

not charged with any substantive drug crime or with conspiracy, and the Court  would have

committed clear error by instructing the jury on crimes with which Defendant was not charged.

Counsel was therefore not ineffective for failing to request improper jury instructions.

        I.      Failure to adequately prepare for trial.

      Defendant alleges in this ground that counsel's cumulative errors as previously addressed

amounted to ineffective assistance of counsel.  Since none of the alleged errors have merit, they

can have no cumulative harmful effect.

        J.      Failure to accompany Defendant to Probation Service interview and to
                disclose and discuss PSR.

      In this claim Defendant maintains that counsel did not accompany him to his interview

with the Probation Officer and did not provide him with a copy of the PSR or discuss it with him

before sentencing and that counsel failed to provide him with any assistance at sentencing.  In

response, counsel acknowledges that he did not accompany Defendant to the interview, but in his

opinion, he "did not need to be present," as he had instructed both Defendant and the Probation

Officer that Defendant "was <u>not</u> to discuss any case specifics during the interview."  Doc. 185,

Ex. 8 (emphasis in original).  Based on counsel's information, Defendant followed his

instructions.  *Id*.  Counsel also states that Defendant's allegation that he did not assist him at

sentencing is "ludicrous."  *Id*.

      The sentencing transcript is clear that counsel did assist Defendant during sentencing,

making lengthy and substantive arguments on his behalf.  Doc. 154.  Furthermore, there is

nothing in the PSR which suggests that Defendant was in any way prejudiced by having the

interview  with the Probation Officer without benefit of counsel.  As to Defendant's assertion

that he did not receive a copy of the PSR before sentencing and that counsel did not review it with him, certainly, counsel had a duty to provide the PSR to Defendant and to review it with him, and failing to fulfill that duty would amount to deficient performance.  However, even if counsel did fail in this duty, Defendant was not prejudiced thereby.  If the Court had directly asked Defendant whether he had reviewed the PSR and he had answered in the negative, the Court would simply have taken a recess or continued the proceeding.  Furthermore, even if counsel advised Defendant "that the court could not sentence him with drugs and they could not use drugs in his case," the Court cannot discern the prejudice.  Defendant was not taxed with any drug quantities, only with being "aware that the currency involved in this case was the proceeds from the sale of illegal drugs," PSR at 15, and there were no drugs to cash conversions made in this case, as there would have been in a drug case.  The money attributed to Defendant was strictly based on funds deposited, seized, or otherwise traceable, and the finding that the money represented drug proceeds was made by the jury, not the Probation Officer.  As this is the only objection Defendant has articulated with regard to the contents of the PSR, and counsel thoroughly objected to and then argued against Defendant's being assessed any additional points related to his knowledge that the money represented drug proceeds, *see* Docs. 96 & 154, the Court cannot find any prejudice from counsel's assumed failure to review the PSR with Defendant.

                K.      Failure to advise Defendant "when deciding what pleas to enter."

      This claim, which was the subject of the only evidentiary hearing held in this case, will be discussed in a separate section *infra*.

                L.      Failure to object to lack of evidence regarding knowledge and willfulness and to request appropriate jury instructions.

This claim is almost identical to the claim asserted in Section II.1.B. and is, for the reasons explained previously, without merit.

2.        Appellate counsel.

In his final claim for relief, Defendant attacks the performance of appellate counsel for failing to argue several of the previously discussed alleged shortcomings of trial counsel. Because all of those claims are meritless, appellate counsel was not ineffective when he failed to argue them on appeal.

III.        Ineffective assistance of trial counsel regarding failure to advise Defendant "when deciding what pleas to enter."

In this claim, which was the subject of a February 12, 2007, evidentiary hearing, Defendant charges that counsel failed to "advise[ ] him of the benefits of pleading guilty [or] the consequences of losing at trial," and that he failed to "advise[ ] him of the Federal Sentencing Guidelines, its application with respect to a conviction entered, whether by guilty plea or jury verdict."  Doc. 173, Amended Mem. at 18.  He also complains that counsel never "advise[d] him of any plea offer of the government," *id*. at 19, and that the only time he was offered a plea was immediately before trial when the United States Attorney "came to [the] room and told trial counsel 28, counsel ask[ed] if [Defendant] wanted to plea [and] [Defendant] said no, because [he] did not understand what the United States Sentencing Guidelines was, he thought [the Government] was talking about 28 years not the Sentencing Table Level 28...."  Doc. 183. According to Defendant, if counsel had "constitutionally advised him, he would have pled guilty."  Doc. 173, Amended Mem. at 18.

In his initial response, counsel stated that he "repeatedly discussed" the Guidelines with Defendant, "including repeated reviews of the table in the back of the guidelines, and the

application of enhancements, including role and the like." Doc. 185, Ex. 9.  He maintained that

he never guaranteed Defendant "what his sentence might be, and at all times (at least six

different occasions) referred to the Sentencing Guidelines in the case," and that, in response to

Defendant's query, he advised him that the only chance he had for receiving a sentence of less

than five years was by cooperating.  *Id.*  In support of his affidavit, counsel attached a draft of a

Memorandum of Interview  from the Internal Review Service, which states that Defendant

advised agents that "he would have to serve five years in jail" and that he was willing to "make

telephone calls directly to three cartel leaders to set up money laundering deals."  *Id.*

With these "he said-he said" statements in hand, the Court attempted to resolve the issue

without the necessity of transporting Defendant to this Court from his place of incarceration in

South Carolina.  Towards that end, the Court directed the parties to "submit any additional

evidentiary materials either supporting or opposing Defendant's claim...."  Doc. 273.  In

response to that order, Defendant's attorney, Clyde M. Taylor, Jr., and the Assistant United

States Attorney who prosecuted this case, Randall J. Hensel, submitted affidavits, and Defendant

filed a response to the order which reiterated his prior allegations.  Docs. 274 & 275.  This

additional material did little to advance this matter towards resolution, and consequently, the

Court appointed  counsel to represent Defendant and scheduled this matter for evidentiary

hearing.

Doc. 277.

On February 12, 2007, the Court conducted an exhaustive hearing on the limited question

of counsel's alleged ineffectiveness regarding his advice about Defendant's sentencing exposure

and the availability of a change of plea.  Doc. 280.  A review of the relevant testimony follows.

Defendant testified first.  According to him, he and Mr. Taylor never discussed a plea

agreement or "about engaging in plea negotiations" or what sentence he could expect if he was

convicted or pled guilty:

> Mr. Taylor was very strict with me and he was very straight.  He always said that
> I was not going to–he was not going to lose the trial because I was not charged
> with conspiracy, and everything that they were bringing in were hearsay; and he
> fought that same argument all of the way up to the appeal.  That was his
> argument, even in his appeal.  He never even discussed that.

> * * *

> All I asked him was, was this the best thing that we were doing and he kept
> saying that we're going to win this trial.

Tr. at 10-11.  Defendant acknowledged that he never specifically told counsel that he was willing

to cooperate with the Government pursuant to a plea agreement.  *Id*. at 11-12.  According to

Defendant, Mr. Taylor never, either before trial or at sentencing, "brought out a copy of the

United States Sentencing Guidelines and sat with [Defendant] and figured out what he thought

the Sentencing Guidelines would result in if [Defendant] lost at trial or if [he] took a plea."  *Id*. at

12-13.  The first time that a plea was mentioned was on the day of trial when the Court directed

the parties to "go back to a room and see if [they] could come to some kind of agreement."  *Id*. at

14.

> I was sitting in a room with Mr. Taylor, Ms. Barbara Sanders, the attorney of my
> brother, Chris Faught.  Mr. Hensel walked to the door and he said "Level 28."  I
> didn't know what Level 28 was.  I thought it might be 28 years.  I had no idea of
> what he was talking about.

> I said, "No, no way."  I said, "Chris can plea out if he wants to but I ain't pleading
> out."  That's just what I said.

> And we got up and we went back and started the jury selection.

> * * *

> I had no understanding.  My understanding was 28 years.  I had no idea of what
> he was talking about.  When he was talking I asked him what is he talking about.

I thought he wasn't talking to me about the guidelines.  I thought he was talking to me about years....

\* \* \*

Sir, I'll be honest.  I blowed up when he said that.  I mean I thought he was talking about 28 years.  I blowed up.  I mean exactly what I said, "No, I ain't going to prison.  If he wants to, I'm getting out of here."  And we went right straight back to the desk and didn't have no time.

*Id*. at 14 & 28.

The following exchange then occurred:

> Q      You didn't tell Clyde Taylor, "I'm not taking 28 years"?

> A      No, I just said I ain't taking that.  That's just what I said.  I ain't taking that.  I'm out of here.  I said my brother can plea or whatever.  I'm out of here.

> Q      So you didn't even ask for an explanation of what 28 was?

> A      No, I didn't understand.  I'm thinking of years, because if you come to me, as I'm ignorant to the law, I would think that you would say you're going to get two years or five years or ten years.  I had no idea, sir.

> Q      But you didn't ask Mr. Taylor?

> A      No, sir, I didn't ask.  I didn't know I had to.

> \* \* \*

> I thought he would tell me.  I thought that was what he was there for, to represent me.

> Q      Well, you just said that you blew up and said, "I'm not taking any plea."

> A      No.  I just said I'm not taking that, and I left.

> \* \* \*

> Q      So there wasn't time to sit down and explain to you and you didn't ask for an explanation.  You just blew up.

> A      Right and left, because we had already waited a year and now we are in

the process of trial and then they are going to come in and offer that.  I have no idea what it is.

Q   But you didn't ask then?

A   Maybe that's my mistake.  I'm not going to say I did.  Maybe I made that mistake.  I mean I'm not going to sit here and say I made that mistake.

Q   And even after all of this, you never got 28 years.  You got 15 years, nine months?

A   Sixteen years.

Q   That's 15 years, nine months?

A   Oh, okay.  I didn't get 28 years, but it sure seems like it.

Q   All right.  Did it start striking you as strange that this 28 years never materialized?

A   No one ever explained to me.  I mean it was after I went to prison that I really got with an inmate and he explained to me how the guidelines work.

*Id*. at 28-30.  Defendant stated that no plea was "really offered" to him and that he was never advised that he did not need an agreement in order to plead to the indictment.  *Id*. at 15.

On cross-examination, Defendant reiterated that he had never seen a Sentencing Guidelines book and that Mr. Taylor had never shown him the Guidelines table.  *Id*. at 20-21. He further stated that Mr. Taylor "guaranteed [him] that [he was] going to walk out a free man." *Id*. at 21.  He nevertheless acknowledged that he had indeed committed money laundering crimes, *id*. at 25-26, and he later testified as follows:

Q   And somehow then you are saying that Mr. Taylor convinced you that you hadn't really done anything wrong and that you weren't going to get any time?

A   He didn't say that.  What I'm telling you is he never explained the guidelines to me to where I would understand the difference or the consequences between taking a plea or going to trial....I thought he was very professional and I still do.  I don't have a grudge on Mr. Taylor.  I

> just think that he made a mistake.  He should have explained to me the
> differences and the consequences; that's all I say.

*Id*. at 27.

Defendant also admitted that he "might have" committed perjury during the trial.  *Id*. at

30-31.

The Government's first witness was Mr. Hensel, the attorney who prosecuted the

underlying criminal charges against Defendant.  Mr. Hensel, who has been employed by the

United States Attorney's Office in the Northern District of Florida for over twenty years, initially

explained the plea policy for this district:

> In the Northern District of Florida, the policy pretty much follows what's called
> the Thornburg Rule and that is that any cases that we handle we don't do, in
> essence, plea negotiations.
> As good as we do in this district is what's called charge bargaining.
>
> * * *
>
> We don't do offense bargaining as far as bargaining for the amount of time.
>
> * * *
>
> The problem that most defense attorneys have because of that is really the only
> benefit most defendants get from pleading guilty to the offenses under our policy,
> is that they have a hope of substantial assistance, is about the only way to avoid
> the onerous penalties that they face...and then they get acceptance for
> responsibility and that's about it.

*Id*. at 38-40.  With charge bargaining, "there is no agreement as to a specific period of time"

regarding the length of the sentence.  *Id*. at 40.

Regarding the events which occurred the first day of trial, Mr. Hensel recalled the Court

directing the parties "'to sit down one more time and see if you all can resolve this thing.'"  *Id*. at

44.  However, he had no recollection of a "discussion about a guideline Level No. 28."  *Id*. at 51.

According to Mr. Hensel,

> The only scenario under which I can see that happen is where Mr. Taylor and Ms.
> Sanders had shared with me their guideline calculations and I retreated to the
> government office and tried to do some guideline calculations on my own to see
> whether I thought...they were reasonable or whether those calculations were
> within the ballpark of the facts as I knew them at that time.  I can see how...the 28
> figure could have been a reasonable figure at that point in time, but I don't have
> any specific recollection of going in and saying, yes, that's a 28.  I can't recall
> that actually happening but I can't say that it didn't.

*Id*. at 51-52.  In any event, Mr. Hensel would not have bound the Government to that calculation

since "the Judge makes the final determination of the guidelines, and I can never make that

agreement."  *Id*. at 46-48.  Furthermore, because of the nature of the charges against Defendant,

a plea "was an all or nothing deal."  *Id*. at 51.  In other words, Mr. Hensel "would not have

allowed [Defendant] to plea to anything other than the entire indictment."  *Id*.

On cross-examination, Mr. Hensel testified that the "figure 28 would have come up...if it

was less than $2 million that was laundered...."  *Id*. at 55.  He also stated that he thought he and

Mr. Taylor discussed Defendant's "providing substantial assistance, whether that opportunity

was open to him," but Mr. Hensel "never prepared a plea and cooperation agreement in this case,

so it must not have gotten very far."  *Id*. at 66 & 68.

Mr. Taylor testified next.  At the time Defendant hired him, counsel had been practicing

law for twenty-eight years and had devoted the last twenty years primarily to "criminal defense

in both state and federal courts."  *Id*. at 78.  "[S]ince...the first day [he] started doing criminal

defense work," Mr. Taylor's standard practice when meeting a client for the first time is "to

advise the client that my job is to find as many options for them as possible, guarantee absolutely

nothing, and do the best job possible and set a fee...."  *Id*. at 80.  With regard to the plea policy in

this District, Mr. Taylor stated that "since the guidelines in '87, basically you plead to the

highest charge the government has filed against your client."  *Id*.

Because of a 2001 tropical storm which flooded his garage, Mr. Taylor had "very few documents relating to [Defendant's] case." *Id*. at 82.  He did, however, recall that "we had plenty of discovery insofar as getting ready for trial," and that he "felt very comfortable with knowing what we were facing in this case." *Id*. at 82-83.  "On more than one occasion," counsel met with Defendant and

> explained to him what the government's theory of prosecution was as it related to the indictment, what they intended to show based on what I had seen in the discovery and I asked him repeatedly questions about how, when, why, who he knew, why did he associate with so and so, why was there all of this cash in the banks, what was his brother doing bringing in money....We covered the waterfront.  There was a lot of information and Mr. Faught, in my opinion, knew exactly what we were doing with it.

*Id*. at 84.

Mr. Taylor was adamant that he "never guaranteed any client, ever, a result from a jury trial, never, ever." *Id*. at 85.  He also denied telling Defendant that "there was no reason to have any kind of plea negotiations because he was going to walk," but he recalled telling him "on more than one occasion that I did not think that we could win the case outright with all 66 counts, and losing one count could arguably be just as bad as losing 20 counts.  So I thought it would be a difficult row to hoe." *Id*. at 85-86

Although counsel knew that Defendant had dropped out of school, "there wasn't a question in my mind that I'm going to have to block print questions and explanations out to Mr. Faught" since he was "not a slow individual from the standpoint of thought process."  Instead, according to Mr. Taylor, Defendant communicated "very well," spoke fluent Spanish, and "knew how to negotiate deals and contracts and his employers thought the world of him at one point in time...." *Id*. at 87.  Counsel further recalled having conversations with Defendant regarding cooperation with the Government:

> Initially, he didn't want to talk about it.  At some point in time he indicated that
> he would have some problems if he was to cooperate because it might be difficult
> on him or his family.  He kept referring at one point in time to, I think in a few
> years earlier, his dad had been kidnapped by rebels or people in Columbia and
> held for ransom.  He was concerned about that and that was brought up on more
> than one occasion.

*Id*. at 87-88.  Thus, before trial, Defendant did not offer to cooperate.  *Id*. at 88.

Mr. Taylor was "[a]bsolutely" positive that he and Defendant discussed the benefits of

pleading guilty:

> Talked about the guidelines, talked about what would be a two-point
> enhancement if he went to trial, testified, and was convicted.  Specifically, even if
> he were convicted of only one count and were acquitted on a bunch of others, the
> government would still come in and suggest that you had committed perjury and
> obstructed justice and you'll get a two-level enhancement.  I talked about that.  I
> talked about the scoring in the guidelines.  We had to estimate the dollar figures.
> I don't ever get pinned down on a range.
>
> I'm well familiar with the plea colloquies that have evolved over the years in
> federal court where the judges repeatedly say has anyone told you or guaranteed
> you what your range was going to be, no one knows, not even me.  We have a
> presentence report.  I went through all of that.
>
> We talked about how role would be an issue in the case,  how he could get
> enhanced for role.  If he pled and cooperated he might be able to have some
> wiggle room there and, in turn, by minimizing the role of his brother, that would
> help Christopher Faught if he in turn pled, because his role was clearly different
> from that of Tod and Tod would be testifying.  So it would be back-up
> information for his brother.  It was covered.

*Id*. at 88-89.

Mr. Taylor also testified that he discussed the consequences of going to trial:

> Well, we could win.  I have told people lightning strikes.  You may win.  In my
> opinion we are going to lose this case.  It is a difficult case, the vast numbers and
> the people they are bringing in.  It was a trial in Panama City, one of te more
> conservative divisions in our district, and that if you did lose, you would for sure
> not get acceptance of responsibility which is two or three points depending on
> where he scored.  Plus you were going to get a two-point enhancement if you
> testified.  So you'll look at a five-point flop just on that issue alone under the
> guidelines.

*Id.* at 89.   According to counsel, Defendant never told him that he wanted to plead guilty and

cooperate, but he was certain that Defendant knew there would be a difference in the application

of the Guidelines depending on whether he pled guilty or went to trial.  *Id.* at 90-91.  Counsel

testified that on at least one occasion, he explained to Defendant what the Government's

expectations would be if he agreed to cooperate:

> I discussed that if you decide to plea, you'll be asked questions about everything
> you have done in your life from A to Z and it will say that in the plea and
> cooperation agreement.  It is a one-way street....[I]f the government asks you 100
> questions–and this is standard spiel–100 questions and you answered 99 of them
> and they don't like the 100th question, you can forget it, you'll get the shaft.
> That's the standard spiel.  I have been doing it for 15 or 20 years.

*Id.* at 92.

While counsel did not have "an independent memory of the number 28 being raised"

after the Court directed the parties to discuss the possibility of a plea, he stated that he would

never have talked in terms of years when discussing Defendant's sentencing exposure.  *Id.* at 93.

Instead, he would have talked in terms of months:

> If the numbers were bandied about that day, Mr. Hensel and I as well as Ms.
> Sanders were trying to determine for our own benefit where he would roughly
> fall; because, obviously, if the statement of facts that the governments gives with
> the presentence report comes out of the blue and you are five levels above, you
> sort of get caught short and there w[ere] discussions as to where we fell, but all of
> the numbers on the dollar amounts were down in the low 20s, maybe even below
> that.  I don't recall specifically.

*Id.*  According to Mr. Taylor, he "never heard the term 28 years until these documents got filed

in conjunction with this case."  *Id.* at 94.  Further, in counsel's view, if, on the day of jury

selection, Defendant had asked him what was happening, "[t]hat would have been a bizarre

question," as he had already gone over everything with Defendant, including his right to testify

or to remain silent.  *Id.* at 94-96.

Mr. Taylor emphatically denied ever assuring Defendant that he "would win the case

because there was no conspiracy count":

> That would be a ludicrous statement for me to make.  The fact that there's no
> conspiracy count is totally irrelevant to the other multiple counts.  That statement
> was never made by me.

*Id.* at 98.  Furthermore, he never had a conversation with the Government "to the point of my

client is willing to negotiate, says he wants to plea, what can you do.  Mr. Faught wanted to go to

trial....He wanted a trial.  He got a trial."  *Id.* at 107-08.  Mr. Taylor also testified that he did not

know why Defendant insisted on taking the witness stand:

> You'll have to ask him.  I don't know.  We went through a number of issues over
> the period of time of representation.  Mr. Faught made a number of decisions
> during the course of representation that I suppose you could wonder about
> forever.  He didn't want to cooperate for four or five different reasons.  One, his
> concern was about family; two, he was concerned about relatives in Colombia;
> three, he was afraid that some of the people that he might be talking about would
> be in jail or have contacts in the States because he was told that under no
> uncertain terms, even if he did cooperate, that he was still going to do prison time.
> There was no way he was not going to do prison time.  The only question was
> how much.

>                                     * * *

> Mr. Faught said he wanted to testify.  I went through the whole shooting match.
> You've got to tell the truth.  Only you are the one that knows the truth.  You have
> the prior statement.  You'll get grilled on it.

>                                     * * *

> If the client wants to testify, he's entitled to testify.  He's supposed to tell the
> truth.

>                                     * * *

> I was worried about Mr. Faught testifying, and he said he wanted to testify and
> that those were the facts, and I let him testify.

*Id.* at 113-15.

Counsel admitted that the figure "28" is "one of the [Guidelines] numbers that could have been relevant to the case." *Id.* at 118-19.  Although it was possible that Mr. Hensel mentioned "28," counsel had no recollection of any specific number being mentioned by him, but "that's certainly one number that could come into play along with anything from as low as minus five off of 27 to minus five off of 29." *Id.* at 119.  In discussing the Guidelines with a client, Mr. Taylor's standard operating procedure, according to him, was as follows:

> I would have had the guidelines book out and I would have gotten the book out and I would take a legal pad.  Rather than show the whole page and all of those numbers and all of those columns, you go you are a criminal history number one and here's the column and you're going to be looking at probably an 18, 19 or 20. Then you take 18, 19 or 20 out on one, figure in 24-30, 27-33, 33-37.  Here is what we were looking at.  Here is also what we are going to be dealing with.  You can get role plus two to four, zero gun enhancement.

> * * *

> [I]n five or six different conversations with the client, we talked about the guidelines.  And my belief is that I would have shown him the book while I was using my legal pad, simply because that's what I do each day of the year.

*Id.* at 120-22.  Mr. Taylor further explained:

> [T]he term 28 years in any conversation with my client never came from my mouth.  There was no basis for it to be 28 years.  It doesn't equate to anything.  I think the statutes are 20....I don't know where the 28 years would have come from or why anybody would have thought 28 years.  He and I never had a conversation anywhere close to his exposure being anywhere near 28 years in any of the conversations that we had.  We're talking in terms of months, maybe a case that he'd say what does that mean, 11 years, 12 years, 14 years and get a third off, eight years or nine years.  It was 28 years never entered a conversation that I had with my client.

> * * *

> The only thing I can tell you is that that day and the day before and the week leading up to the case, his wife had been over.  She was from Colombia and he had another good friend of his.  We were talking in terms of 11, 12, 13 years, less any kind of cooperation and/or breaks we could get through a plea and getting the three points off.  That's all I can tell you.  And it was all done in months, so it

never got to 28 years.  I don't know where the term came from.

*Id*. at 123-24.

Mr. Taylor concluded:  "My orders were to go to trial, notwithstanding my explanations to the client about his other options, including plea straight up, plea cooperate."  *Id*. at 124-25.

Shortly after this hearing, Defendant moved for the issuance of a subpoena for Christopher Faught and for further evidentiary hearing.  Doc. 282.  According to Defendant, testimony from Defendant's brother "is pertinent and material to the issue of what Tod Faught understood his putative sentence would be pursuant to a plea agreement" and is admissible to show Defendant's state of mind.  *Id*.  If subpoenaed, Christopher Faught would testify as follows:

> that he recalls that on the morning of trial, before jury selection, the judge directed the parties to attempt to negotiate a plea.  The defendants and their respective counsel closeted themselves in a conference room.  Each defendant spoke with his counsel outside the hearing of the other.  Christopher Faught recalls that the prosecution offered him a substantially reduced sentence if both he and his brother entered pleas; if he alone pled, he would not benefit as much.  Tod Faught rejected the plea offer.  After the unsuccessful negotiation session ended, Tod and Christopher Faught walked out of the room together, whereupon Tod Faught told Christopher Faught that he rejected the plea bargain because he would be required to serve some "twenty years."

*Id*.

Having carefully considered the matter, the Court finds that Defendant has not carried his burden of persuasion on this final claim of ineffectiveness.  The parties agree that the Court directed them to meet on the first day of trial immediately before voir dire, and while neither Mr. Hensel nor Mr. Taylor had any independent recollection of the number 28 being mentioned during that meeting, they acknowledged that it was certainly possible that Mr. Hensel, after calculating Defendant's Guidelines range himself, may have announced to the group that it was

"28," as Defendant stated in his affidavit, or a "Level 28," as Defendant testified at the hearing.

With that said, however, the Court does not find it credible that over the course of a year's representation, Mr. Taylor, who has been practicing criminal law in federal court for the entire time that the Sentencing Guidelines have been in effect, never once reviewed Defendant's potential sentencing exposure with him. Instead, Mr. Taylor's demeanor on the stand, his adamance regarding matters which he discusses and never discusses with a client, and the manner in which he handles the Guidelines discussions with a client convince the Court that he certainly understands how the Guidelines operate, their importance, and the various factors that might affect the final calculation, that he has, over the course of years, established a standard procedure for explaining them and their operation to his client, and that he would never promise his client a particular outcome in any proceeding.

Because the Court does not believe that counsel neglected the Guidelines discussion with the instant Defendant or that he promised Defendant he would not be convicted,[6] it cannot find Defendant's testimony to the contrary credible. Instead, the Court finds the more plausible chain of events to have been these: Counsel reviewed Defendant's sentencing exposure with him in terms of months[7] before converting the term into years, but he never told Defendant that his sentencing exposure was twenty-eight **years**, since, under no circumstances, was Defendant ever

---

[6]The Court does not find it even minimally conceivable that counsel promised Defendant he would "walk out a free man." After all, Defendant had already admitted his involvement in money laundering to the agents before Mr. Taylor was even hired, and the fact that counsel chose vigorously and repeatedly to attack the admission of the Rule 801 evidence does not support Defendant's argument.

[7]The Sentencing Guidelines speak in terms of months, not years, and given counsel's experience with the Guidelines, there is no doubt in this Court's mind that counsel would have explained them to Defendant in those terms.

looking at a twenty-eight year term of imprisonment.  After Mr. Hensel announced "28" or

"Level 28," Defendant "blowed up," immediately left the room, and did not wait for or request

further explanation, just as he testified.  Without any basis in fact, Defendant jumped to the

conclusion that Mr. Hensel was referring to years when he mentioned the number "28," a

conclusion Defendant later shared with his brother.[8]  As Defendant himself recognized, he

obviously made a mistake, did not ask counsel for further direction, and proceeded to trial.

When counsel heard Mr. Hensel say "28" or "Level 28," he would never himself have thought in

terms of years, and having already discussed these issues with his client, he would not have

suspected that Defendant was thinking in those terms either.  Defendant had previously directed

counsel to go to trial, and Mr. Taylor followed his directions.  The Government never offered

Defendant a plea and cooperation agreement, and thus, counsel never had a plea offer to discuss

with Defendant.

In light of all of the circumstances, the Court finds that Defendant has not established that

Mr. Taylor neglected any of his duties towards him or that no competent attorney would have

taken the action Mr. Taylor took in this case.

## CONCLUSION

Having carefully considered the matter, the Court finds that none of Defendant's claims

have merit, and thus, it respectfully **RECOMMENDS**:

That the motion to vacate, Doc. 173, be **DENIED**;

That the ex parte application for issuance of subpoena and further evidentiary hearing,

---

[8]The Court accepts as true Defendant's representation of what his brother would say if
this Court resumed the evidentiary hearing in this matter.  With that said, then, further hearing is
not necessary.

Doc. 282, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this 30th day of March, 2007.


 s/A. Kornblum                                                   
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

        **A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**